**WAIALUA AGR. CO., Limited, v. UNITED SUGAR WORKERS, ILWU LOCAL 142 et al.**

**Civ. No. 1332.**

United States District Court
D. Hawaii.

July 17, 1953.

Blaisdell & Moore and Livingston Jenks, Honolulu, Hawaii (E. C. Moore, Jr., and R. M. Torkildson, Honolulu, Hawaii, of counsel), for plaintiff.

Bouslog & Symonds, Honolulu, Hawaii (James A. King, Honolulu, Hawaii, of counsel), for defendants.

McLAUGHLIN, Chief Judge.

The defendants have moved to dismiss this action for damages for breach of a collective bargaining contract in an industry affecting interstate and foreign commerce. Their grounds are, first, that section 185(a) of 29 U.S.C.A., under which the action is brought, is unconstitutional in its delegation of jurisdiction to the courts of the United States, since Congress has removed the factor of diversity of citizenship. Next, the defendants contend that because the complaint indicates that some of the employees represented by the defendants are in an agricultural occupation, the defendant unions representing them are not amenable to this suit because agricultural workers are expressly excepted from the Labor Relations Act's definition of "employees". The third and final ground is that the complaint is vague, ambiguous, and defective under Rule 8 of the Federal Rules of Civil Procedure, 28 U.S.C.A., which requires a short and concise statement of the claim for relief.

1. Constitutionality of 29 U.S.C.A. § 185 (a).

The most pertinent portions of this section provide as follows:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

As we understand the defendants, they say that Congress did not create any substantive federal rights, nor rules to indicate under federal law when a contract would be found to exist, and under what conditions a breach thereof would have occurred, bringing about strictly federal liability; therefore, any alleged breach of contract arises out of the laws of this Territory, and no federal law is involved in this action.

A second argument is in effect that a finding of congressional intent to provide such substantive rights would mean that Congress intended to controvert the national policy as declared by the Supreme Court in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and thereby require the development of two systems of law in labor contracts—one in federal jurisdictions, and one in the States, depending upon the jurisdiction in which the action may be brought. The dual system objection is illustrated in another aspect by the example of the individual employee who, having no cause of action in the federal courts under this section as a beneficiary of such a contract, must resort to the local courts to enforce any existing rights thereunder.

The omission by Congress of diversity of citizenship as a basis of jurisdiction has the effect of making irrelevant to this case the principles and policies declared in Erie R. Co. v. Tompkins, supra. The ruling in that case had the great object of securing, in federal courts, *in diversity cases,* the application of the same substantive law as would control if the suit were brought in the courts of the state where the federal court sits. See United States v. Standard Oil Co., 1947, 332 U.S. 301, 307, 67 S.Ct. 1604, 91 L.Ed. 2067.

It does not seem fatal to constitutionality that an individual employee may be relegated to the state courts for protection of his own individual rights as a beneficiary under such a contract. Congress in 29 U.S.C.A. § 185 has reached only the parties occupying the status of employers and labor organizations as defined in the Act. See Schatte v. International Alliance, etc., D.C., 84 F.Supp. 669, affirmed 9 Cir., 182 F.2d 158, rehearing denied, 9 Cir., 183 F.2d 685, certiorari denied, 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608, rehearing denied, 340 U.S. 885, 71 S.Ct. 194, 95 L.Ed. 643; Zaleski v. Local 401, etc., D.C.1950, 91 F.Supp. 552; John Hancock Mut. Life Ins. Co. v. United Office and Professional Workers, D.C.1950, 93 F.Supp. 296, 306. Here we do not find dual systems of law on the same question, but rather an attempt to compare two different types of action, between parties of different identity and status.

Article III of the Constitution provides, in part, that the judicial power of the United States shall extend to all cases in law and equity arising under the Constitution, the Laws of the United States, and to controversies between citizens of different States. Since Congress has seen fit to remove the jurisdictional basis of diversity of citizenship the resolution of the current problem must depend upon whether Congress has made valid use of some constitutional power creating a substantive law of the United States out of which this type of action can arise.

■ Congress has the power to regulate commerce with foreign nations and among the several States: Constitution, Art. 1, § 8. This power is plenary, and may be exerted to protect interstate commerce, no matter what the source of the dangers which threaten it. N.L.R.B. v. Jones and Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. It may involve the regulation of activities within a state the criterion being the effect of those activities upon interstate commerce, or upon the exercise of the power to regulate it. United States v. Wrightwood Dairy Co., 1942, 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726. It therefore seems unquestionable that Congress, in carrying out its purpose expressed in 29 U.S.C.A. § 141 of promoting the full flow of commerce by encouraging the regularity of labor-management relations in businesses in or affecting interstate commerce, has the power to attach federal rights and liabilities to collective bargaining contracts made therein. It has subjected certain acts or practices found in collective bargaining negotiations to the exclusive control of an administrative board; some of these practices involve violations of existing contracts—such as the regulations against premature termination of existing contracts without complying with certain named conditions: 29 U.S.C.A. § 158(d). This control over contracts in this field has been upheld. International Union, etc. v. O'Brien, 1950, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978.

Now, if the power exists to regulate contracts between parties having this status, the question remains, *did* Congress create federal substantive incidents to such contracts by section 185—alone or by implication therefrom, considering the Act in its entirety?

■ We think it did, for the following reasons:

Section 185 would be meaningless on any other hypothesis than that substantive rights were intended, and Congress will not be considered to have taken the anomalous action of providing a remedy and a forum in which to enforce it, without creating a right to which the remedy would attach. The existence of the power of Congress to create such liability, and the legislative

history of the Act indicate that the intent did exist in Congress to create substantive rights, and that it chose the language used as being sufficient to do so. Wilson and Co. v. United Packinghouse Workers, D.C. 1949, 83 F.Supp. 162.

State laws requiring plaintiff in a contract action to show bad faith, and providing that the action could be maintained only if all the members of the union were jointly and severally liable do not apply; the substantive law to be applied would not be that of the State, and these provisions are irrelevant in the federal action. Subsection (b) of section 185, cited above, when it imposes liability on the union sued for money judgments as an entity (where such liability did not exist before), when it removes the common liability from the individual members (which liability did exist before, if members were properly served), and when it provides capacity in the union to sue or be sued, declares federal rights and liabilities in these circumstances. Shirley-Herman Co. v. International Hod-Carriers, etc., 2 Cir., 1950, 182 F.2d 806, 17 A.L.R.2d 609.

In general accord with these decisions are those in Textile Workers Union v. Aleo Mfg. Co., D.C.1950, 94 F.Supp. 626 and Colonial Hardwood Floor Co. v. International Union, D.C.1948, 76 F.Supp. 493.

The Court of Appeals for the Ninth Circuit has also considered this point; while it indicated its realization that the statement was not necessary for the decision before it, the Court said:

"Section 301 [29 USC 185] was not enacted merely to provide a new forum for the enforcement of contracts theretofore enforceable solely in the state courts. Had such been its sole purpose the constitutionality of the section as to actions in which diversity of citizenship was lacking might well be questioned. But the wording of the section and its place in the Taft-Hartley Act demonstrates that the section was designed to protect interstate and foreign commerce by creating a new substantive liability, actionable in the federal courts, for the breach of a collective bargaining contract in an industry affecting interstate or foreign commerce." Schatte v. International Alliance, etc., 182 F.2d 158, 164.

■ Therefore, it appears that section 185(a), considered as it should be with the other subdivisions of the same section, and with the Act in its entirety, is not an invalid extension of the judicial power of the United States. Though Congress did not undertake the task of expressing all the substantive federal law of collective bargaining contracts, it is now in the course of declaration by the courts, on the premise that Congress did impose federal liability.

## 2. The Agricultural Exemption

In support of the motion to dismiss, the defendants argue that, since the complaint shows that some of the plaintiff's employees represented by the union are engaged in agricultural labor, the defendants are exempt from suit under this section in federal courts. The plaintiff argues that since the complaint shows some members of the unions to be personnel in transportation, milling and sale operations, the defendants are not exempt.

The Act defines employees in section 152, and states that the term "shall not include any individual employed as an agricultural laborer * * *." Through cross-reference between sections, this definition also applies in the section involved here, section 185. Whether this exemption of individuals applies, in a manner exactly parallel, to labor organizations representing both agricultural and non-agricultural employees is the main question now presented.

Several courts have considered the agricultural exemption contained in the Fair Labor Standards Act: Farmers Reservoir Irrigation Co. v. McComb, 1949, 337 U.S. 755, 766, note 15, 69 S.Ct. 1274, 93 L.Ed 1672; Bowie v. Gonzalez, 1 Cir., 1941, 117 F.2d 11; Calaf v. Gonzalez, 1 Cir., 1942, 127 F.2d 934; Waialua Agr. Co. v. Maneja, 9 Cir., 1949, 178 F.2d 603; Puerto Rico Tobacco Marketing Coop. Ass'n v. McComb, 1 Cir., 1950, 181 F.2d 697; Waialua Agr. Co. v. Maneja, D.C.Haw. 1951, 97 F.Supp. 198.

These courts were construing a different statute which supplied a Congressional definition of the term "agriculture", 29 U.S.C.A. § 203(f), a definition not included in the Labor-Management Relations Act. In applying the Fair Labor Standards Act definition, however, these courts drew a line between the planting, cultivation, and harvesting of cane (agriculture), and the transportation, milling and sale thereof (non-agriculture).

The definition supplied contains two parts; the first part of the definition resulted in the drawing of the line just mentioned. The second part has led most of the courts to hold that processing by the grower on his own land after harvest is still agriculture, while any processing he might do on products of others from different lands would not be agricultural in character. The variation has been in the above cited decision of the Ninth Circuit Court, which indicated that even processing businesses dissociated from the land of the grower could be agricultural under this definition.

Classification of labor as agricultural or non-agricultural in the sugar industry has been considered by the National Labor Relations Board in Pepeekeo Sugar Co., 59 N.L.R.B. 1532 (1945). The Board found that for its Labor Relations Act purposes, of the typical sugar production operations, also involved here, certain types are agricultural in nature, and the remainder are non-agricultural. This finding, of course, must now be considered in the light of the "rider" presently appended by Congress to its bill of appropriation of funds for the Board; it restrains the Board in the use of those funds in organizing, or in holding any hearings involving agricultural workers *as defined in the Fair Labor Standards Act*, 29 U.S.C.A. § 203(f): Title III, Act of July 5, 1952, Pub. Law 452, 82d Cong. 2d Session, U.S.Code Congressional and Administrative News 1952, p. 360.

The Pepeekeo case still seems a reasonably reliable guide for the following reasons:

First, the purpose of the legislative "rider"—from its location and manner of enactment—is evidently that of restricting the activities of the Board in the fields where it has exclusive power, and to do something less than amend the Labor Relations Act itself, which is the law governing this court in this decision.

Second, the courts cited above were considering a different statute, 29 U.S.C.A. § 203(f), more detailed in its two part definition of agriculture, and passed for a different purpose, with which we are not here concerned. If we use them as an aid, however, it appears that those opinions, made under the same restrictions as Congress imposed on the NLRB *after* the Pepeekeo case, substantiate the NLRB ruling on what is and what is not agricultural employment in the sugar industry under the Labor Relations Act. Thus we might expect the Pepeekeo decision to be the same today, were the issue presented to the Board anew.

Reference to the complaint shows that the contract sued upon here covers agricultural, transportation, milling and sales workers employed by the plaintiff. More specific allegations (Par. X of the complaint) are that the alleged breaches of contract involve:

(a) Tournatwo drivers and harvesting crane operators who load and haul the cut cane to the mill;

(b) Harvesting and milling operations employees;

(c) Employees engaged in transportation of cane to the mill.

Thus it appears from the allegations that persons engaged in agriculture as discussed above, and employees engaged in non-agricultural pursuits upon the plantation are equally covered by the collective bargaining contract with the defendant unions, and are affected by the alleged breaches of the agreement.

Let it be here clearly stated that in this litigation plaintiff has not tendered an argument that under the irrelevant FLSA definition of agriculture, its plantation transportation and milling workers are not engaged in "agriculture" within the meaning of that definition.

The Effect of Multiple Representation:

The effect of the exclusion of agricultural workers from the application of the Labor Relations Act, 29 U.S.C.A. § 151 et seq., on the jurisdiction of federal District Courts in suits against unions representing both agricultural and non-agricultural personnel has apparently not received the direct attention of any court before this time. The only cases cited by the parties, or disclosed by research, deal with this point in an indirect manner or by dictum. In Le Baron v. Kern County Farm Union, D.C.1948, 80 F.Supp. 151, the regional director of the NLRB brought action to enforce an order of the Board. The principal defense was that the Local, being composed entirely of agricultural workers, was without the jurisdiction of the Board. The court's decision, however, was not founded on this point, but on the theory that even if the local were immune, it was acting as an agent for a national union, which, *because it represented other types of employees as well as agricultural ones,* was included in the coverage of the Labor-Management Relations Act, and that the principles of agency permitted the suit regardless of the nature of the defendant Local.

In DiGiorgio Fruit Corp. v. N.L.R.B. 1951, 89 U.S.App.D.C. 155, 191 F.2d 642, 28 A.L.R.2d 377, the corporation had brought a proceeding before the Board based on alleged unfair labor practices by the Kern County Farm Labor Union, and a local of the Teamsters' Union. In reviewing the action of the Board, the Court agreed that there were no unfair labor practices, and no incidents of agency between this entirely agricultural local and the National Farm Labor Union. However, the court indicated in no uncertain terms its continuing agreement with the Board's statement that the national union, representing as it does workers both agricultural and otherwise, is a labor organization within the definition of the Labor Management Relations Act. The court said, 191 F.2d at page 647, that Congress apparently intended to exclude from the Act labor organizations composed exclusively of agricultural workers. A little further on, it makes the more specific statement: "The National Union is a labor organization within the meaning of the Act; it includes as members workers other than agricultural laborers." That this statement had a serious basis is indicated by the case of Barr Packing Co., 82 NLRB 1, 9, 35 (1949). There the Board considered and approved findings of fact and conclusions of law in the Intermediate Report of the case that the National Farm Labor Union is a labor organization within the meaning of section 2(5) of the Act, 29 U.S.C.A. § 152(5).

While it may be conceded that these statements do not control here, they appear entitled to weight as expert opinions on the point. They tend toward the conclusion that, if a labor organization represents both excluded and included employees, they do qualify as labor organizations intended to be governed by the Act by a simple application of its definitions. Doubts created by a situation demonstrating characteristics of both excluded and included members may be resolved by reference to the highly industrialized nature of this enterprise, which it seems would have caused a substantial loss of the common denominator of personal contacts in individual bargaining.

█ In view of the above discussion, this Court holds that the defendants in the present suit, representing as they do both types of workers, are not immune to suit in federal courts.

3. Compliance with Rule 8

On the remaining point of objection, it now appears that without somewhat more than usual particularity of detailed allegations these questions could hardly have been raised or decided at this stage of the procedure. For future guidance of both parties, however, reference to Rule 8, Federal Rules of Civil Procedure, is recommended, with a view toward elimination of long and involved statements of claim whenever possible.

The motion to dismiss is denied.